## CASE NO. 23-1511

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔞𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

JAMES TIMOTHY COOK,

*Plaintiff - Appellant,*

v.

ROANOKE ELECTRIC STEEL CORPORATION,
d/b/a Steel Dynamics Roanoke Bar Division,

*Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT ROANOKE

## RESPONSE BRIEF OF APPELLEE

Elaine D. McCafferty
WOODS ROGERS
VANDEVENTER
BLACK, PLC
123 East Main Street
5th Floor
P. O. Box 2496
Charlottesville, VA 22902
434-220-6833
elaine.mccafferty@wrvblaw.com

Agnis C. Chakravorty
WOODS ROGERS
VANDEVENTER
BLACK PLC
Wells Fargo Tower
10 South Jefferson Street
P. O. Box 14125
Roanoke, VA 24038
540-983-7727
achakrav@woodsrogers.com

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1511__    Caption: _James Cook v. Roanoke Electric Steel Corporation_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Roanoke Electric Steel Corporation_
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       Steel Dynamics, Inc.


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
      If yes, identify all such owners:
       Steel Dynamics, Inc.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Elaine McCafferty                    Date: _____5/20/2023_____

Counsel for: Roanoke Electric Steel Corporation

Print to PDF for Filing

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................. iii

I.     STATEMENT OF THE ISSUES ....................................................1

II.    STATEMENT OF THE CASE .......................................................2

     A. Proceedings Below ....................................................................2

     B. Statement of Facts ....................................................................3

          1.  Cook's Employment with SDRBD .......................................3

              a)  The Baghouse....................................................4

              b)  Luck Asks Cook to Assist Shifflett..................................4

              c)  Grace and Luck Meet with Cook and Explain the Assignment Is Outside the Baghouse..................................6

              d)  The Critical Difference Between Working Inside Versus Outside the Baghouse.......................................7

              e)  Cook Sends an E-Mail Misrepresenting That He Was Authorized to Work in the Baghouse Knowing That It Could Get Grace and Luck in Trouble.........................................9

              f)  Adams and Grace Respond Immediately to Cook's False Accusation................................................12

              g)  The Events After Adams' Meeting with Cook ...........................13

          2.  Cook Is Terminated for Lying and Endangering the Jobs of Luck and Grace............................................................14

III.    SUMMARY OF THE ARGUMENT ...........................................16

IV.   ARGUMENT ................................................................................19

       A. Standard of Review .............................................................19

       B. Virginia Code §§ 40.1-51.2:1 and 40.1-51.2:2 Provide the Exclusive
          Remedy for Claims Regarding Workplace Safety ....................................21

       C. Virginia Code § 40.1-27.3 Provides No Protection for Cook's
          Dishonest Conduct ................................................................23

            1.  Cook Believes He Reported a Violation of Policy, Not Unlawful
                Conduct.........................................................................24

            2.  Cook Lacked Good Faith and Recklessly Disregarded the Truth.......25

            3.  There Is No Causal Connection Between Cook's Safety Concern
                and His Termination................................................................28

       D. Virginia Code § 40.1-51.2:1 Does Not Bar Employers From
          Terminating Dishonest Employees .........................................35

V.    CONCLUSION ................................................................................38

VI.   ORAL ARGUMENT ................................................................................38

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ............................................................. 19-20, 27

*Bandy v. Advance Auto Parts, Inc.*,
 No. 7:11-CV-00365, 2012 WL 6018741 (W.D. Va. Nov. 29, 2012), *aff'd*,
 535 F. App'x 260 (4th Cir. 2013) ................................................ 34-35

*Bass v. E.I. DuPont de Nemours & Co.*,
 28 F. App'x 201 (4th Cir. 2002) ....................................................... 23

*Beale v. Hardy*,
 769 F.2d 213 (4th Cir. 1985) ........................................................... 20

*Calloway v. Lokey*,
 948 F.3d 194 (4th Cir. 2020) ........................................................... 19

*Clark v. General Internal Medicine Group, Inc.*,
 2021 WL 3669322 (E.D. Va. Aug. 18, 2021) ................................ 17-18, 36, 37

*Colquitt v. Bon Secour Mercy Health*,
 No. 4:21CV53, 2022 WL 479093 (E.D. Va. Feb. 16, 2022), *aff'd sub nom.*
 *Colquitt v. Bon Secours Mercy Health*, No. 22-1288, 2022 WL 17848949
 (4th Cir. Dec. 22, 2022) ................................................................. 24

*Conyers v. Martial Arts World of Richmond, Inc.*,
 639 S.E.2d 174 (Va. 2007) ............................................................. 25

*Crews-Sanchez v. Frito-Lay, Inc.*,
 2022 WL 2792207 (W.D. Va. July 15, 2022) ...................................... 17, 29, 37

*CTB, Inc. v. Hog Slat, Inc.*,
 954 F.3d 647 (4th Cir. 2020) ....................................................... 17, 34

*EEOC v. Cromer Food Servs.*,
 414 F. App'x 602 (4th Cir. 2011) ...................................................... 32

*Erie R.R. Co. v. Tompkins*,
 304 U.S. 64 (1938) ....................................................................... 22

*Hawkins v. PepsiCo, Inc.*,
 203 F.3d 274 (4th Cir. 2000) ........................................................... 30

*Hinchman v. Performance Food Grp., Inc.*,
   2023 WL 4540486 (E.D. Va. July 14, 2023) ............................................. 18, 25

*Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*,
   514 F.3d 327 (4th Cir. 2008) ............................................................... 22

*Jessup v. Barnes Grp., Inc.*,
   23 F.4th 360 (4th Cir. 2022) ............................................................... 33

*Jones v. Phillips*,
   850 S.E.2d 646 (Va. 2020) ................................................................. 25

*Lawton v. Walker*,
   343 S.E.2d 335 (Va. 1986) ............................................................ 18, 25

*Mack v. S.C. DOT*,
   2015 WL 1297836 (D.S.C. Jan. 28, 2015) ............................................. 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................ 20

*Othentec Ltd. v. Phelan*,
   526 F.3d 135 (4th Cir. 2008) ............................................................... 20

*Peters v. Jenney*,
   327 F.3d 307 (4th Cir. 2003) ............................................................... 23

*Rowe v. Goldsboro Wayne Transp. Auth.*,
   No. 5:13-CV-754-F, 2015 WL 3650086 (E.D.N.C. June 11, 2015), *aff'd*,
   628 F. App'x 183 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 207 (2016) ............ 34

*Sch. Bd. v. Giannoutsos*,
   380 S.E.2d 647 (Va. 1989) ............................................................ 19, 22

*Scott v. United States*,
   328 F.3d 132 (4th Cir. 2003) ............................................................... 21

*Shenandoah Pub. House, Inc. v. Gunter*,
   427 S.E.2d 370 (Va. 1993) ................................................................. 26

*Sylvia Dev. Corp. v. Calvert Cty.*,
   48 F.3d 810 (4th Cir. 1995) ............................................................... 20

*Wells v. Whitaker*,
   151 S.E.2d 422 (Va. 1966) ............................................................ 35-36

*Whiteman v. Chesapeake Appalachia, L.L.C.*,
    729 F.3d 381 (4th Cir. 2013) ................................................................ 19

*Wieters v. Roper Hosp., Inc.*,
    58 F. App'x 40 (4th Cir. 2003) ..................................................... 29-30

*Williams v. TMS Int'l, LLC*,
    2021 WL 4071868 (E.D. Va. Sept. 7, 2021) ................................... 22

## Statutes

Va. Code Ann. § 40.1-27.3 ............................................................... *passim*

Va. Code Ann. § 40.1-51.2:1 ........................................................... *passim*

Va. Code Ann. § 40.1-51.2:2 ...................................... 1, 19, 21, 22, 23

## Other Authorities

16 Va. Admin. Code 25-60-110 ................................................. 35

*Black's Law Dictionary* (11th ed. 2019) ............................... 25

## I.    STATEMENT OF THE ISSUES

In this appeal from a final order granting summary judgment in favor of Appellee Roanoke Electric Steel Corporation d/b/a Steel Dynamics Roanoke Bar Division ("SDRBD" or "Roanoke mill"), and dismissing retaliation claims brought by Appellant James Timothy Cook ("Cook"), the issues presented for review are:

1.      Whether Virginia Code §§ 40.1-51.2:1 and 40.1-51.2:2 provide the exclusive remedy for claims regarding workplace safety concerns and thus bar Cook's retaliation claim under Virginia Code § 40.1-27.3;

2.      Whether there is a triable issue of fact with respect to Cook's retaliation claim under Virginia Code § 40.1-27.3, where undisputed evidence establishes that Cook (a) does not believe he reported unlawful conduct, (b) lacked good faith and recklessly disregarded the truth when making his alleged report, and (c) was terminated because he materially misrepresented the scope of work he was asked to perform and knew his misrepresentation could jeopardize other employees' jobs; and

3.      Whether there is a triable issue of fact with respect to Cook's retaliation claim under Virginia Code § 40.1-51.2:1, where undisputed evidence establishes that he was terminated for lying and imperiling the jobs of other employees, not for raising any safety issue.

1

## II.    STATEMENT OF THE CASE

### A.    <u>**Proceedings Below**</u>.

This case is about SDRBD's former employee, Cook, who misrepresented that his supervisor and a safety coordinator authorized him to violate a cardinal safety rule. Specifically, Cook represented that he was authorized to work in part of a steel mill called the "baghouse" without proper training or protective equipment. Following his termination for this misrepresentation, he filed suit against SDRBD in the United States District Court for the Western District of Virginia ("District Court"), asserting claims of retaliation in violation of Virginia Code §§ 40.1-27.3 and 40.1-51.2:1.

SDRBD moved for summary judgment after the parties completed discovery. JA 21-23, JA 413-415. Following full briefing by the parties and oral argument on the motion, the District Court issued a memorandum opinion granting summary judgment. JA 535-553. In its opinion, the District Court observed that §§ 40.1-27.3 and 40.1-51.2:1 prohibit essentially the same conduct: "terminating an employee because he or she made a safety complaint to a supervisor." JA 547. The District Court then determined, based on undisputed facts, that Cook was not terminated because he reported a safety concern. JA 548-549. Rather, Cook was terminated because he sent an e-mail falsely stating that he was authorized to work *in* the baghouse without adequate training or proper equipment, and Cook's

2

superiors believed he made the misrepresentation to endanger the jobs of his

supervisor and the safety coordinator. JA 548-549.

The District Court further determined that Cook lacked good faith when he

sent the e-mail because he was told immediately beforehand that his assignment

was *outside* the baghouse, a location where Cook was properly trained to work and

no protective equipment was needed for the job he was asked to perform. JA 547-

548. As a result, the District Court concluded Cook could not satisfy the good faith

requirement under § 40.1-27.3. The District Court entered final judgment in

accordance with its opinion. JA 553. This appeal followed.

### B.    Statement of Facts.

#### 1.    Cook's Employment with SDRBD.

SDRBD operates a steel mill located in the City of Roanoke. JA 331. Cook

began his employment with SDRBD in 2001, and was employed there as a

millwright from 2006 until his termination on April 23, 2021. JA 7 ¶ 7, JA 31-33.

As a millwright, Cook worked in the "mold shop," where he primarily repaired and

rebuilt molds for casting operations. JA 32.

At the time of his termination, Cook's immediate supervisor was Mike Luck

("Luck"), Mechanical Maintenance Supervisor. JA 33, JA 367-368. Luck's

supervisor was Aaron Larson ("Larson"), Melting and Casting Manager, and

Larson reported to Jerry Adams ("Adams"), General Manager. JA 33. Adams was

3

the highest-ranking employee at SDRBD. JA 34. Adams reported to Christopher

Graham ("Graham"), the Senior Vice President of Long Products at SDRBD's

parent company, Steel Dynamics, Inc. JA 157, JA 330. In addition, Alicia Grace

("Grace") was the Safety Coordinator and reported directly to Adams. JA 204, JA

221. Luck, Grace, Adams, and Larson were involved in the events leading to

Cook's termination. Graham and Adams jointly made the decision to terminate

Cook for knowingly misrepresenting that he was authorized to work inside the

baghouse without adequate training or protective equipment. JA 157-161, JA 361.

### a)      The Baghouse.

The Roanoke mill has a filtration system to remove dust, fumes, vapors, and

other particulates from the furnace and melt shop. JA 36-37, JA 50, JA 310. These

particulates are transported through a series of fans and ducts to the baghouse

building, where they are filtered and eventually removed as waste. JA 37-38, JA

50, JA 310. The baghouse building is in a separate area several hundred yards

away from the main plant. JA 182-183, JA 410, JA 320-321, JA 441. In April

2021, two SDRBD employees, Billy Shifflett ("Shifflett") and Benjamin Hall

("Hall"), were specifically assigned to work in the baghouse. JA 283. Cook worked

briefly in the baghouse for approximately six months in 2005 or 2006. JA 39.

### b)      Luck Asks Cook to Assist Shifflett.

The events that led to Cook's termination took place on April 20, 2021. On

4

that day, Hall was absent, so Luck asked Cook to assist Shifflett with some work

outside the baghouse because he preferred his employees to work in teams for

safety reasons. JA 183-186, JA 370 ¶ 3. According to Cook, Luck asked him to

help Shifflett "up in the baghouse." JA 40-41. The assignment involved staging

equipment for an upcoming fan motor change outside of the baghouse, but Cook

maintains that Luck did not describe the specific assignment at this time. JA 43-44,

JA 369-370.

In response to the request to help Shifflett, Cook stated, "that's fine" "but I

don't have my respirator training or my HAZMAT training,"[1] explaining "they are

both expired." JA 41. Cook added if he "got the okay from the safety coordinator

[Grace], then [he] would be more than happy to go do the work." JA 44.

While Cook did not know Grace's qualifications, he knew that she was

ultimately responsible for safety protocols at the Roanoke mill. JA 44-47. Grace

has been employed at SDRBD since August, 2020. JA 202-203. As Safety

Coordinator, she is responsible for safety compliance at the facility, including

compliance with Occupational Safety and Health Administration ("OHSA")

standards and regulations. JA 204-206, JA 213. She also has extensive experience

with safety regulations concerning confined space environments, such as the space

inside of the baghouse. JA 281-283.

---

[1] HAZMAT is an acronym for hazardous materials.

### c) Grace and Luck Meet with Cook and Explain the Assignment Is Outside the Baghouse.

As requested, Luck called Grace, and the three met together in Luck's office to discuss the nature and location of the assignment. JA 43-45, JA 227-228, JA 370 ¶ 4. At the meeting, Luck explained that the assignment involved removing nuts and bolts from ductwork that was outside. JA 48, JA 228. In responses to requests for admission, Cook agreed that the work he was asked to perform during this meeting was outside of the baghouse:

> 4. Admit that you, Mike Luck, and Alicia Grace met on April 20, 2021 and discussed the location where the work was to be performed on April 20, 2021 to help stage equipment for an upcoming fan motor change.
>
> RESPONSE: Admitted
>
> 5. Admit that Mike Luck told Alicia Grace during the meeting on April 20, 2021, in your presence, that helping stage equipment for an upcoming fan motor change was to be performed **outside** the building where the "baghouse" his located.
>
> RESPONSE: Admitted

JA 370 (emphasis added); *see also* JA 43 (Cook's testimony that he discussed his responses to the requests for admission with his attorney).

After Luck described the assignment, including that it was outside of the baghouse, Grace asked Cook if Luck's description was consistent with his understanding of the assignment. JA 228. Cook confirmed he had the same understanding, but stated he was concerned because he was not respirator fit tested

6

and had not completed HAZMAT training recently. JA 229. Grace responded that

Shifflett was HAZMAT trained and would know what to do if any issues arose,

and that because he would be working outside the baghouse, he did not need to

wear a respirator. JA 229.

Grace then asked if Cook had any additional questions. JA 229. Cook said

he felt he needed to "cross his T's and dot his I's" to "make sure he was doing

everything correctly." JA 229. Cook also said that he would send an e-mail to

confirm the conversation, and that if he saw "any dust at all, that he was going to

take pictures and videos and send them to OSHA." JA 60, JA 388, JA 229. Grace

responded that if he saw anything concerning, he could call her anytime. JA 229-

230. Luck then asked Cook why he had a problem with the assignment. JA 388.

Cook said he felt that Luck was "bullying him" and he was not going to talk about

it anymore.[2] JA 388. Cook then left Luck's office. JA 388.

### d)     The Critical Difference Between Working Inside Versus Outside the Baghouse.

The baghouse has an area of confined space where filter bags that collect

particulates are located. JA 317-318. Employees who work in that confined space

are required to wear a respirator under OSHA and Virginia Department of Labor

---

[2] Grace did not see anything that resembled "bullying" and felt Luck "handled himself very well" in the meeting. JA 287.

and Industry ("VDOLI") regulations. JA 317-319, JA 178. Additionally, HAZMAT training is required within the confined space in the baghouse. JA 319.

In contrast, outside the baghouse, where Cook was assigned to work, there is no requirement for a respirator under OSHA and VDOLI regulations unless there is an "upset condition." JA 313, JA 318; JA 282-283. An "upset" condition is where something is not "normal," like dust being released from the vents leading to the baghouse. JA 313, JA 321-322. On April 20, 2021, there was no "upset" condition which would have required Cook to wear a respirator to do the work he was asked to perform outside the baghouse. JA 318, JA 321-322. Cook did not see any dust, nor did he feel "unsafe" when he ultimately completed his assignment outside the baghouse. JA 84-85.

HAZMAT training is also not required under the pertinent regulations outside the baghouse, but all employees get such training as part of the Roanoke mill's commitment to safety. JA 318-319, JA 311-313. Cook, in fact, had such training in August of 2020 and March of 2021. JA 323-324. Consistent with the lack of any requirement for HAZMAT or respirator training while working outside a baghouse, Cook has not been able to point to any specific regulation—now or on April 20, 2021—that requires such training. JA 97, JA 99-100.

**e)**   **Cook Sends an E-Mail Misrepresenting That He Was Authorized to Work in the Baghouse Knowing That It Could Get Grace and Luck in Trouble.**

After his meeting with Luck and Grace, Cook sent Grace the e-mail he mentioned during their meeting. Despite the fact that they discussed work outside of the baghouse at the meeting, Cook's e-mail stated:

> This e-mail is just to confirm that you authorized me to work in the baghouse today. We have established that I'm not certified to wear a respirator and that I'm not certified in hazmat training. Mike Luck is also aware and sent me to work in that area.

JA 375. Compounding the falsehood, the e-mail also copied Luck's and Grace's supervisors, Larson and Adams. JA 375. According to Cook, he was using what he believed was the "proper chain of command" when he copied Adams to relay his alleged safety concerns, and this belief was based on an e-mail he had sent Luck on March 23, 2021 to which Luck allegedly never responded. JA 9 ¶19, JA 376. Cook has admitted, however, that the e-mail in question had nothing to do with a chain of command for reporting safety concerns but rather absenteeism and who to contact in regard to leave under the Family and Medical Leave Act. JA 376, JA 372 ¶ 13.

Indeed, Cook conceded that it was not his normal practice to e-mail Larson or Adams if he had questions about work. JA 66. He only remembered e-mailing Adams once in the past about a diversity issue and never concerning any work which Luck had assigned. JA 67-68. Moreover, Cook knew that sending the e-mail

9

falsely accusing Grace (and by extension Luck) of authorizing him to work in the

baghouse without a respirator or HAZMAT training could get Grace and Luck in

trouble:

> Q     So is it your normal practice that any time you have a question
>        with your supervisor, you e-mail Jerry [Adams] and Aaron
>        Larson?
> A     No, it's not normal practice, no.
> Q     Okay. So why did you do it on this occasion?
> A     Because safety is a pretty big deal, especially HAZMAT
>        training; that's a big deal. And I wanted to make sure
>        everything was in the proper order and everything was
>        documented.
> Q     So you were trying to let Jerry [Adams] know that they had
>        authorized you to work in the bag house, and that was a safety
>        issue, correct?
> A     I was just trying to make him aware of it, yes.
> Q     Yeah. So if, in fact, it's true, that would have been a, you know,
>        a cardinal rule, safety violation, Alicia Grace and Mike Luck
>        could have been in trouble, correct?
> A     Yes.

 JA 66. "Cardinal rule" is a term used at SDRBD (and in the steel industry) to

describe safety rules that are designed to prevent injuries and fatalities. JA 162, JA

285.

Similarly, both Grace and Luck knew that if they had in fact authorized

Cook to work in the baghouse without proper safety precautions, they would face

discipline, possibly termination. During her deposition, Grace testified:

> Q     I think you testified that you were concerned that this e-mail
>        went to Jerry Adams?

A Absolutely, yes.

Q And could you explain why?

A Well, I just feel like he was trying --Mr. Cook was trying to get me in trouble with my supervisor when I hadn't done anything wrong, and more importantly, he lied in that very first sentence. I know that we've talked about that word "in," but I never authorized Mr. Cook to work inside of the baghouse.

Q I mean, that is a big difference?

A Absolutely.

. . .

Q How about telling someone to work inside of a baghouse without a respirator; would you consider that to be a cardinal rule?

A Absolutely.

Q Okay, so if in fact you had told Mr. Cook that he had to work inside the baghouse without a respirator, you would have been telling him to violate a cardinal rule, correct?

A And I wouldn't have a job.

JA 284-286. Luck testified during his deposition:

Q All right, and like we said, we do need to -- if you look at that e-mail, is there anything in that e-mail that concerned you when you got it?

A A few things. He's saying, "in the baghouse," and he was never asked to work in the baghouse; it was outside of the baghouse.

Q And when you say, "he," you are talking about --

A Mr. Cook.

Q Okay.

A The other thing is the carbon copy to Jerry and Aaron, that is usually not how we do things. We thought that we had this settled, that it was safe for him to go up there and work, and to go up the chain like this, it's kind of -- it looks to me like he's trying to get somebody in trouble.

Q When you say, "somebody," who are you talking about?

11

A      Me and Alicia.

Q      And why would you think that you would get in trouble?

A      Well, we're asking him to do something that is unsafe. That is what he was saying, that we're asking him to do something that he's not trained to do or that is very unsafe.

JA 176-177. Consistent with the testimony of Cook, Grace and Luck, Adams stated that working in the baghouse without HAZMAT or respirator training "would be a violation of a cardinal safety rule," and "could have led to [Grace's and Luck's] termination." JA 141-142.

### f)    Adams and Grace Respond Immediately to Cook's False Accusation.

Within ten minutes of receiving Cook's e-mail, Adams replied and asked Cook, Grace and Luck to come to his office to have a discussion before proceeding further. JA 380. Additionally, because Adams did not know whether Grace had in fact authorized Cook to work in the baghouse without proper training, he told Cook that if he was asked to do something unsafe, he expected him not to do it. JA 380, 143.

Grace also responded to Cook via e-mail shortly after receiving Cook's e-mail:

 Hi Tim,

As discussed, the scope of your work is *outside*, to stage and prep around #2 fan. Billy Shifflett is haz mat trained and will be with you the entire time.

12

> According to Mike, there should [be] no exposure to any dust while
> staging and prepping.
> Should you have any additional concerns, you can reach out to Mike
> and I at any time. As mentioned, I am taking half a days' vacation but
> can be reached on my cell phone[.]
>
> Thanks,
> Alicia

JA 379 (emphasis added); *see also* JA 74 (Cook's testimony that he does not

disagree with anything in Grace's e-mail).

Thereafter, Cook, Grace and Luck all met in Adams' office to discuss the

scope of the work Cook was being asked to perform. JA 144, JA 370 ¶ 6. Adams

wrote a statement summarizing what was discussed in the meeting immediately

afterwards. JA 147-148, JA 382-383. As reflected in that statement, Adams asked

Cook if he was asked to work in the baghouse as stated in his e-mail. JA. 382.

Cook replied that he was asked to work outside the baghouse, not in the baghouse.

JA. 382; *see also* JA 370 ¶ 7 (Cook's admission that he told Adams that Luck

asked him to work outside the building where the baghouse is located). Cook also

admitted that in the meeting with Adams, he stated he did not get along with Luck.

JA 371.

### g)    The Events After Adams' Meeting with Cook.

After the meeting, Cook went to help Shifflett with the work outside the

baghouse. JA 84, JA 372 ¶ 10-11. Shifflett worked on a manlift while Cook was on

13

the ground. JA 84-85. When describing the work, Cook stated he "didn't really do anything" except hand parts to Shifflett and get some items from the warehouse, like bug spray. JA 84-85. Shifflett was not wearing a respirator and Cook did not see anything, like dust, that caused Cook to feel unsafe. JA 84-85, JA 372 ¶ 12.

Meanwhile, Adams asked Grace, Luck, and others to write statements as part of his investigation. JA 148-151. Both Grace's and Luck's statements reflect that Cook was asked to work outside and that Grace never authorized Cook to work in the baghouse. JA 384-388. Adams also interviewed Shifflett and asked Shifflett to provide a statement. JA 151-153, JA 389. Shifflett told Adams during the interview that the work he completed with Cook did not require respirator or HAZMAT training. JA 152. Finally, Adams asked Larson to provide him information on Cook's prior work history. JA 155. That information revealed prior incidents of Cook's disruptive behavior. JA 155, JA 390-397.

## 2.    Cook Is Terminated for Lying and Endangering the Jobs of <u>Luck and Grace</u>.

After Adams gathered all the witness statements and information regarding Cook's prior work history, he forwarded it to Graham. JA 156-157, JA 401-414. While Adams could have made the decision to terminate on his own, it was Adams' practice to communicate with Graham on such issues. JA 341, JA 157. Adams explained his recommendation to terminate Cook as follows:

> Q    Okay. Why did you make that recommendation to terminate, that termination was what you wanted to do?
>
> A    Because of the -- through the investigation it became evident that he understood that this was not the safety incident that he conveyed. By conveying it the way he did, it put other employees' employment in jeopardy.
>
> Q    Who were the other employees?
>
> A    Mike Luck and Alicia Grace. And sending me that e-mail, copying me on that e-mail after he had already been told where he was working and where he wasn't working, and that it did not include respirator, and it did not include or did not require HAZMAT training, after that, he sent the e-mail. And with the documentation that we received back, that showed a pattern of this disruptive behavior, especially in reference to leadership, that all together brought us to that decision.

JA 157-158. Further, Adams confirmed that the decision to terminate was "absolutely not" made because Cook raised a safety issue. JA 161.

Graham concurred with Adam's recommendation noting that Cook "[1]ied," was "not trustworthy," and was "scheming to imperil the continued employment of certain co-workers," which had caused "[d]isruption of the workplace." JA 401. Graham has been in the steel industry since 1984 and is familiar with baghouses. JA 351. He knows of no regulations that require a respirator or HAZMAT training to work outside a baghouse. JA 351-352. Conversely, if someone was asked to work in the baghouse without a respirator or HAZMAT training—where such protocols are necessary—it would be a serious safety violation leading to termination. JA 343.

Cook raising a safety concern also played no role in Graham's decision. Indeed, employees are encouraged to report safety concerns and are recognized positively when they bring safety concerns to management. JA 347. Lying, however, is considered misconduct and Cook lied when he sent the e-mail stating that Grace had authorized Cook to work in the baghouse without proper safety precautions. JA 353-355. The company requires its employees to be trustworthy and has consistently terminated employees who breach that trust. JA 355. In accordance with this long-standing practice, Graham agreed to terminate Cook "for lying, showing that he wasn't trustworthy," "disrupting the workplace, and imperiling the continued employment" of others, which is "not the type of behavior" SDRBD "expect[s] its employees to tolerate." JA 361.

After Adams and Graham conferred and decided to terminate Cook's employment, he was issued a violation notice stating, "Falsified communication of a safety incident that put other employees jobs at risk. This will result in termination of employment." JA 381.

## III.    SUMMARY OF THE ARGUMENT

Notwithstanding Cook's attempts to complicate this case and manufacture factual disputes, the matter at bar is simple. Cook was lawfully terminated for misrepresenting that Grace and Luck authorized him to work *in* the baghouse without HAZMAT and respirator training, when, in fact, he was asked to work

16

*outside* the baghouse. As explained by Cook and other employees, working in the baghouse without HAZMAT or respirator training would violate a cardinal safety rule. JA 66, JA 284-286, JA 176-177, JA 141-142. Cook's misrepresentation was therefore tantamount to accusing Grace and Luck of authorizing a serious violation of safety rules and could have led to their termination. JA 141-142.

Cook has admitted that shortly before he sent the e-mail falsely asserting he was authorized to work in the baghouse, he met with Grace and Luck who told him his assignment was outside the baghouse. JA 370 ¶¶ 4-5. Indeed, Grace immediately responded to the e-mail to correct Cook's misrepresentation, stating "[a]s discussed, the scope of your work is outside." JA 379. Grace, Luck, Adams, and Graham all concluded that not only did Cook lie by stating he was asked to work in the baghouse, but that he did so to endanger Luck's and Grace's jobs. JA 284-286, JA 176-177, JA 157-158, JA 361. On this record, Cook's "self-serving opinion [that he was terminated for raising a safety concern] cannot, absent objective corroboration, defeat summary judgment." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *see also Crews-Sanchez v. Frito-Lay, Inc*., 2022 WL 2792207, at *12 (W.D. Va. July 15, 2022) (granting summary judgment of § 40.1-27.3 claim where employe was terminated for disclosing confidential information to third parties and her "lack of candor in describing the circumstances of that disclosure"); *Clark v. General Internal Medicine Group., Inc.,* 2021 WL

17

3669322, at *9 (E.D. Va. Aug. 18, 2021) (granting summary judgment of § 40.1-51.2:1 claim because employee was terminated for "unprofessional behavior" and confusion caused by his "inaccurate reports"). Accordingly, the District Court correctly granted summary judgment of Cook's claims under Virginia Code §§ 40.1-27.3 and 40.1-51.2:1 as both statutes require a causal connection between an employee's protected activity and his termination.

Cook's claim under § 40.1-27.3 also fails because he was not acting in good faith when he sent the e-mail stating he was asked to work in the baghouse. Cook knew that his assignment was outside the baghouse and that accusing Grace and Luck of authorizing him to work in the baghouse could get them in "trouble." JA 66, JA 370 ¶¶ 4-5. As the District Court concluded, these circumstances "directly refute a finding of good faith." JA 548; *see also Hinchman v. Performance Food Grp., Inc.*, 2023 WL 4540486, at *3 (E.D. Va. July 14, 2023) (finding a good faith act under § 40.1-27.3 is an act "done honestly" (quoting *Lawton v. Walker*, 343 S.E.2d 335 (1986)). Even if Cook did not intend to make a false statement, § 40.1-27.3 does not "[p]ermit an employee to make statements . . . that are in reckless disregard of the truth." Va. Code § 40.1-27.3(B)(2). Cook's misrepresentation that he was authorized to work in the baghouse was, at a minimum, made in reckless disregard of the truth.

Finally, Cook cannot recover under both §§ 40.1-27.3 and 40.1-51.2:1.

Section 40.1-51.2:1 and its counterpart, Virginia Code § 40.1-51.2:2, provide both

a right and a remedy for redressing claims of discrimination based on workplace

safety complaints. Where, as here, "a statute creates a right and provides a remedy

for the vindication of that right," the "remedy is exclusive unless the statute says

otherwise." *Sch. Bd. v. Giannoutsos*, 380 S.E.2d 647, 649 (Va. 1989). As a result,

§§ 40.1-51.2:1 and 40.1-51.2:2 bar Cook's claim under § 40.1-27.3.

## IV.    ARGUMENT

### A.    <u>Standard of Review</u>.

This Court "review[s] a summary judgment *de novo*, applying the same

standard that the district court was required to apply." *Calloway v. Lokey*, 948 F.3d

194, 201 (4th Cir. 2020). "[S]ummary judgment is warranted if, from the totality of

the evidence, including pleadings, depositions, answers to interrogatories, and

affidavits, the court believes no genuine issue of material fact exists for trial and the

moving party is entitled to judgment as a matter of law." *Whiteman v. Chesapeake*

*Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013). Only factual disputes that

affect the outcome of the case preclude summary judgment. *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining a factual dispute is "material" if

it "might affect the outcome of the suit under the governing law" and "genuine" if

19

there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party).

When determining whether there is a triable issue of fact, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. "Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Sylvia Dev. Corp. v. Calvert Cty.,* 48 F.3d 810, 818 (4th Cir. 1995) (citation omitted). As to whether an inference is reasonable, the Court takes a holistic approach and considers the inference "'in light of the competing inferences' to the contrary." *Id.* (quoting *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986)). To defeat a motion for summary judgment, a "scintilla" of evidence is insufficient; "the non-moving party must present sufficient evidence such that 'reasonable jurors could find by a preponderance of the evidence' for the non-movant ." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 252 (1986)). A nonmoving party cannot create a genuine issue of material fact merely by "the building of one inference upon another." *Othentec Ltd. v. Phelan,* 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

## B.     Virginia Code §§ 40.1-51.2:1 and 40.1-51.2:2 Provide the Exclusive Remedy for Claims Regarding Workplace Safety.

Cook's retaliation claim under Virginia Code § 40.1-27.3 is barred by Virginia Code §§ 40.1-51.2:1 and 40.1-51.2:2 because these statutes provide the exclusive remedy for claims of retaliatory discharge based on an employee's safety complaint. Although the District Court did not reach this argument and instead assumed, without deciding, that Cook could pursue claims under both §§ 40.1-27.3 and 40.1-51.2:1, this Court can affirm for any basis that appears on the record. JA 547 n.14; *see Scott v. United States*, 328 F.3d 132, 137 (4th Cir.2003) ("We are, of course, entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court.").

Section 40.1-27.3 prohibits employers from retaliating against employees who make a good faith report of "a violation of any federal or state law or regulation" to a supervisor, governmental body, or law enforcement official. Va. Code § 40.1-27.3(A)(1). The alleged report here, Cook's e-mail to Grace and Luck regarding work in the baghouse, concerns (an albeit false) safety risk. JA 375, JA 7-9 ¶¶ 10-11. Sections 40.1-51.2:1 and 40.1-51.2:2 also address discrimination based on complaints about workplace safety. Section § 40.1-51.2:1 provides that "[n]o person shall discharge or in any way discriminate against an employee because the employee has filed a safety or health complaint or has testified or otherwise acted to exercise rights under the safety and health provisions of this title

for themselves or others." Section § 40.1-51.2:2, which immediately follows

§ 40.1-51.2:1 in the Virginia Code, prescribes an extensive remedial scheme for

violations of § 40.1-51.2:1. Read together, §§ 40.1-51.2:1 and 40.1-51.2:2 create

an antidiscrimination right regarding workplace safety complaints and provide a

remedy for vindication of that right.

The Supreme Court of Virginia has long held that "where a statute creates a

right and provides a remedy for the vindication of that right, then that remedy is

exclusive unless the statute says otherwise." *Sch. Bd. v. Giannoutsos*, 380 S.E.2d

647, 649 (Va. 1989); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)

(federal courts apply state law when adjudicating state law claims); *Horace Mann*

*Ins. Co. v. Gen. Star Nat. Ins. Co.,* 514 F.3d 327, 329 (4th Cir. 2008) (explaining

that federal courts apply the interpretation of a state law articulated by the state's

highest court or anticipate how that court would rule when presented with

unsettled questions).

Here, Cook cannot pursue his claim under § 40.1-27.3 because, as noted by

several Virginia state and federal courts, §§ 40.1-51.2:1 and 40.1-51.2:2 provide

the exclusive remedy for employee complaints regarding alleged safety concerns in

the workplace. *Williams v. TMS Int'l, LLC*, 2021 WL 4071868, at *5 (E.D. Va.

Sept. 7, 2021) (collecting cases and noting "numerous Virginia courts have

concluded that § 40.1-51.2:2 provides the exclusive remedy for claims of

retaliatory discharge resulting from an employee's health and safety complaints");
*see also Bass v. E.I. Dupont De Nemours & Co.*, 28 F. App'x 201, 205 (4th Cir.
2002) (affirming dismissal of claim under § 40.1-51.2:1 because employee failed
to follow procedure set forth in § 40.1-51.2:2). As such, Cook's claim for
retaliatory discharge under § 40.1-27.3 is not viable.

### C.    Virginia Code § 40.1-27.3 Provides No Protection for Cook's Dishonest Conduct.

The retaliation claim under Virginia Code § 40.1-27.3 was also properly
dismissed because Cook failed to meet the requirements of the statute. As relevant
here, the statute prohibits retaliation against an employee "because" he "in good
faith reports a violation of any federal or state law or regulation to a supervisor or
to any governmental body or law-enforcement official." Va. Code § 40.1-
27.3(A)(1). This language imposes at least three requirements on an employee
seeking to recover for alleged retaliation. First, an employee's report must involve
a "violation of any federal or state law or regulation." Second, the report must be
made in "good faith." And third, the term "because" mandates a causal connection
between the report and the employee's termination. *Cf. Peters v. Jenney*, 327 F.3d
307, 320 (4th Cir. 2003) (explaining that a retaliation claim under Title VII
requires a "causal connection" between "the protected activity and the adverse
action"). Additionally, the statute provides no protection to an employee who
makes "statements or disclosures knowing that they are false or that they are in

reckless disregard of the truth." Va. Code § 40.1-27.3(B)(2). The undisputed facts establish that Cook cannot meet all three requirements, and that the assertion in his e-mail to Grace was, at a minimum, in reckless disregard of the truth.

### 1.    Cook Believes He Reported a Violation of Policy, Not Unlawful Conduct.

Cook has conceded that he cannot identify any federal or state law or regulation that requires respirator or HAZMAT training for working outside of a baghouse. JA 97, JA 99-100. In fact, he does not maintain that working outside of a baghouse without such training is unlawful. Rather, he asserts that SDRBD has a "policy" that requires employees to "get HAZMAT training" and "be respirator certified" in order to work in the baghouse area. JA 57-58; *see also* Opening Br. 12-13 (citing Cook's testimony that he believes he was asked to violate a policy).

Putting aside that there is no such policy, § 40.1-27.3 does not protect employees for reporting violations of policies. The plain language of the statute applies only to a "federal or state law or regulation." Va. Code § 40.1-27.3(A)(2). *See Colquitt v. Bon Secour Mercy Health*, No. 4:21CV53, 2022 WL 479093, at *5 (E.D. Va. Feb. 16, 2022), *aff'd sub nom. Colquitt v. Bon Secours Mercy Health*, No. 22-1288, 2022 WL 17848949 (4th Cir. Dec. 22, 2022) (dismissing claim under § 40.1-27.3(A)(1) where plaintiff "fail[ed] to allege sufficient facts to show that the alleged 'misconduct' and 'unethical practices' of [defendants] violated 'any federal or state law or regulation'"). Because Cook lacks a belief that SDRBD's conduct

24

violates a federal or state law or regulation, the District Court correctly granted summary judgment of the § 40.1-27.3 claim for this reason alone.

### 2. Cook Lacked Good Faith and Recklessly Disregarded the Truth.

Cook was not acting in good faith when he sent the e-mail falsely stating that he was authorized to work in the baghouse. The term "good faith" is not defined in § 40.1-27.3. When construing a statute, the Supreme Court of Virginia is bound by the "plain meaning" of its language. *Conyers v. Martial Arts World of Richmond, Inc.*, 639 S.E.2d 174, 178 (2007). The plain meaning of "good faith" is a "state of mind consisting" of "honesty in belief or purpose." Good Faith, *Black's Law Dictionary* (11th ed. 2019); *see also Jones v. Phillips*, 850 S.E.2d 646, 650 (Va. 2020) (relying on definition in Black's Law Dictionary when interpreting statutory term); *Hinchman v. Performance Food Grp., Inc.*, 2023 WL 4540486, at *3 (E.D. Va. July 14, 2023) (finding a good faith act under § 40.1-27.3 is an act "done honestly" (quoting *Lawton v. Walker*, 343 S.E.2d 335 (1986)).

Cook could not have honestly believed he was asked to work in the baghouse when he sent the e-mail asserting Grace and Luck authorized him to work there. As the District Court observed, Cook admitted that immediately before sending this e-mail, Luck told him his assignment was *outside* the baghouse. JA 547, JA 370 ¶¶ 5, 7. Cook also sent the false e-mail to Adams, the General Manager and the highest ranking individual at the Roanoke mill, even though it

25

was not Cook's common practice to copy Adams on such communications and he was never asked to do so. JA 66. And, notably, Cook knew that sending the e-mail to Adams could get Luck and Grace in trouble. JA 66. These undisputed facts establish that Cook was not acting in good faith.

Further, even if Cook did not know the falsity of his statement, he made it with "reckless disregard [for] the truth" and is thus afforded no protection from discharge by § 40.1-27.3. Va. Code § 40.1-27.3(B)(2). Cook knew that stating Grace and Luck authorized him to work in the baghouse was tantamount to asserting they violated a cardinal safety rule. JA 66. Yet he took absolutely no care to accurately describe the location of his work, thereby potentially misleading Luck's and Grace's superiors and endangering their jobs. This conduct plainly evinces a reckless disregard for the truth. *Cf. Shenandoah Pub. House, Inc. v. Gunter*, 427 S.E.2d 370, 372 (Va. 1993) (reckless disregard is "a high degree of awareness of probable falsity").

In an attempt to resist this conclusion, Cook claims the District Court discounted his evidence of good faith. Opening Br. 21. He maintains that there are three genuine issues of material fact regarding good faith: (1) his motivation for sending the e-mail; (2) whether working outside can expose an employee to dust; and (3) whether SDRBD employees commonly work outside the baghouse with respirators. Opening Br. 12-15.

26

With respect to Cook's motivation, he testified that he sent the e-mail to "confirm" he had a "conversation" with Grace and Luck, and inform Adams they authorized him to "work in the baghouse," which he believed was a "safety issue." JA 49, JA 66. There is no dispute that working in the baghouse without proper training is a safety issue. The fact that Cook identified a safety issue does not suggest he acted in good faith because the issue he identified—working in the baghouse—was a misrepresentation of Grace's and Luck's instructions.

Similarly, any potential exposure to dust while working outside does not bear on whether Cook honestly believed he was asked to work in the baghouse or whether Adams and Graham terminated him for misrepresenting the location of his assignment. *See Anderson*, 477 U.S. at 248 (factual dispute is "material" if it "might affect the outcome of the suit"). And there is no potential for exposure to dust outside unless there is an "upset condition," which did not occur on April 20, 2020. JA 313-322, JA 282-283, JA 84-85, JA 372 ¶ 12.

Cook's evidence that other employees sometimes wear respirators outside is also immaterial. *See* Opening Br. 13-15. Cook never saw an employee wearing a respirator outside while performing the work he was asked to complete on April 20, 2021. JA 117. Instead, he recalled seeing employees wearing respirators outside while doing "a bag change," which, unlike Cook's assignment, involves going inside the baghouse and bringing bags outside. JA 115-116. Cook's reliance

27

on the testimony of Brian Woodford is also misplaced. Woodford has only seen Shifflett and other employees wearing respirators outside while on railcars, which are located about 40 feet from the baghouse. JA 462-463, JA 481-483. Woodford testified that the area outside the baghouse is not dusty, unless there is something "wrong" or "not working right," and has walked outside the baghouse without a respirator. JA 463, JA482. In sum, evidence that employees wear respirators outside while completing jobs unrelated to Cook's assignment does not present a material dispute of fact, especially because it does not suggest Cook acted in good faith when asserting he was authorized to work in the baghouse. The District Court correctly rejected Cook's arguments and determined the circumstances surrounding his e-mail "directly refute a finding of good faith." JA 548.

**3.    There Is No Causal Connection Between Cook's Safety Concern and His Termination.**

Undisputed facts establish that Cook was terminated because the decision makers, Adams and Graham, believed that Cook was lying and that he was trying to get Luck and Grace in trouble with his e-mail. JA 157-158, JA 161, JA 401, JA 353-355. This undercuts any argument that Cook was retaliatorily discharged in violation of § 40.1-27.3, because it demonstrates that there is no causal relationship between Cook's safety concerns and his termination.

28

A recent decision from the Western District of Virginia, *Crews-Sanchez v. Frito-Lay, Inc*., 2022 WL 2792207 (W.D. Va. July 15, 2022), is instructive.[3] There, the plaintiff was terminated for disclosing confidential information to a third party and "her lack of candor in describing the circumstances of that disclosure." *Id.* at *12. In granting summary judgment, the court reasoned:

> Virginia Code § 40.1-27.3 . . . . simply doesn't cover the facts of this case. While Plaintiff argues broadly that "her disclosures" related to C.D. [another employee] and "her daily adherence to OSHA regulations regarding safety at the workplace qualified as protected activities pursuant to [§ 40.1-27.3]," . . . this provision does not insulate Plaintiff's conduct of disclosing confidential employee health information . . . . Frito-Lay terminated Plaintiff for disclosure to Mr. Jones of that information, and **for Plaintiff's lack of candor in describing the circumstances of that disclosure** to Plaintiff's superiors at Frito-Lay. As above, even if Plaintiff engaged in protected activity, which the Court need not decide, "the manner in which [she] engaged in this activity is not protected," in this case.

*Id.* (emphasis added). As in *Frito Lay*, § 40.1-27.3 "simply doesn't cover the facts of this case." *Id*. Even if Cook engaged in protected activity (which he did not), "the manner in which [he] engaged in this activity"—lying in his e-mail to Adams which he understood could get Grace and Luck in trouble—is not protected. *Id*.; *cf. Wieters v. Roper Hosp., Inc.*, 58 F. App'x 40, 45 (4th Cir. 2003) (affirming

---

[3] This case is currently on appeal to the Fourth Circuit. This Court should consider the persuasive value of the district court's opinion because there is a dearth of authority construing § 40.1-27.3, which was enacted only three years ago.

29

summary judgment in favor of employer, where employee claimed he was terminated for whistleblowing, because uncontested evidence showed employee expressed his complaints in a "disruptive and unprofessional manner").

Even if this Court concludes Cook did not necessarily lie, undisputed evidence shows that Adams and Graham reasonably believed Cook was dishonest and terminated him for that reason. Where, as here, an "employer gives a legitimate, non-discriminatory reason for discharging the plaintiff," it is not this Court's "province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc*., 203 F.3d 274, 279 (4th Cir. 2000).

Nevertheless, Cook insists that portions of Graham's testimony suggest he was terminated for stating he would take "notes" concerning the work and give them to OSHA. Specifically, Cook relies on the following testimony:

> Q. So from your perspective, given your understanding of the situation, did Mr. Cook in any way engage in any sort of misconduct at the workplace?
>
> A. Yes, I think that -- that he was asked to do something, part of his job; there is no job description that says that he's not to be asked to do what he was asked to do. He was **put the facts in front of him** and he could have decided not to --**to ask to not have to do it and have a further hearing**, but **what I read is he's going to take notes to OSHA** and very-- things that are disruptive to getting the job done and distractions, so again, **we have things where supervisors tell us to do things. It may be a harsh term, but if it is a fair ask and you don't do it, that is insubordination** to some degree, so I think that

30

> it's semantics, but **the entirety of the story here is what landed [on me]**, as he said, they had -- they have the authority to terminate without me, and so when I -- when --we don't take these things lightly, and that is why we try to talk to each other even though Jerry has the authority, and he is expected to push back if I recommend something. If you notice, he has not represented much in the e-mails, but I recommended that **my reading of the situation was that it was a terminable offense**.

JA 344-346 (emphasis added); *see also* Opening Br. 21-22. Even looking solely at this portion of Graham's testimony, it does not suggest that giving notes to OSHA is a terminable offense. Rather, it shows Graham viewed Cook's insubordination, along with the "entirety of the story," as warranting termination. And the phrase "take notes to OSHA" must be read in context with the statement immediately preceding it, "He was put the facts in front of him and he could have decided not to --to ask to not have to do it and have a further hearing." In other words, Cook could have declined to work outside the baghouse until the matter was discussed further, but inexplicably, he instead sent an e-mail falsely asserting he was asked to work in the baghouse.

Moreover, as the District Court observed, the testimony immediately following the above quoted portion directly contradicts Cook's argument:

> Q It may be in the e-mail, but sitting here today, were you ever made aware that at any time Mr. Cook had indicated that he might take pictures or other sort of like video evidence of things that he considered to be an OSHA violation?

31

A I thought that I saw that mentioned in the book.

Q **Is that problematic to you in any way?**

A **No.** There is nothing to hide there. It's not—it's not—you know,
you either do it or you don't, meaning that if there is documentation,
if there is something there, then we want to know about it. **It has
nothing to do with my recommendation**.

JA 346 (emphasis added), JA 550.[4] Cook asks the Court to ignore this testimony

and consider only the portion involving taking notes to OSHA. But when

reviewing a grant of summary judgment, this Court views "the evidence as a whole

rather than zooming in and focusing on deposition testimony that is taken out of

context or is viewed in isolation." *E.E.O.C. v. Cromer Food Servs., Inc.*, 414 F.

App'x 602, 606 (4th Cir. 2011); *see also Mack v. S.C. Dep't of Transp*., 2015 WL

1297836, at *16 (D.S.C. Jan. 28, 2015) (an employee cannot show an employer's

proffered reason for an adverse employment action is pretextual "by citing to select

lines of deposition testimony taken out of context"). Viewed in context, Graham's

testimony establishes that Cook's termination was not based on his comments

about OSHA.

　　　　Finally, Cook maintains that there is a genuine dispute of material fact about

the meaning of "baghouse" and whether he was directed to work inside or outside

---

[4] The "book" Graham referred to is the compilation of documents Adam sent
to Graham as part of the termination process. *See* JA 401-402.

the baghouse. Opening Br. 4-5, 7-11. He asserts that baghouse refers to the "dust

collection system," which includes areas that are both inside and outside. JA 112-

113. The District Court correctly concluded that any dispute about the precise

meaning of baghouse is immaterial and does not preclude summary judgment. JA

536 n.2. In reaching this conclusion, the Court credited Cook's testimony that Luck

initially asked him to work "up in the baghouse" without specifying that exact

location of the assignment. JA 537 n.4. Because Luck explained the assignment

was outside in the meeting with Grace and Cook,[5] the District Court determined

---

[5] As previously noted, Cook admitted in responses to requests for admission that during the meeting with Grace and Luck, Luck stated his assignment was outside the baghouse. JA 370 ¶¶ 4-5. When asked during his deposition if work outside the baghouse or inside the baghouse was discussed during the same meeting, Cook replied, "I'm not really sure if we had those conversations." JA 61.

Nevertheless, Cook cites select lines of his deposition transcript suggesting that he stated work "inside" the baghouse was discussed at this meeting. Opening Br. 5 (citing JA 44-45). The testimony immediately following Cook's statement about work "inside" indicates that Cook was asked to work "at" the baghouse. JA 45 ("Are you saying that he told you to work inside the bag house?" A: "At the bag house, at, in, I'm not really sure of the verbiage at this point, it's been so long.").

In short, Cook's only unequivocal answer regarding the location of his assignment is his response to requests for admission, which indicate he was told the assignment was outside the baghouse. JA 370 ¶¶ 4-5. In any event, to the extent there is conflict in Cook's statements about the location of his work, it does not create a material dispute of fact. *See Jessup v. Barnes Grp., Inc*., 23 F.4th 360, 367 (4th Cir. 2022) ("[A] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

any ambiguity in Luck's initial directions was not material, given that Cook

understood the location of his assignment before he sent the e-mail. JA 537 n.4, JA

548, JA 370 ¶¶ 4-5. Cook has not challenged this sound reasoning on appeal.

Cook has also not presented any reason for questioning the reasonable belief

of Grace, Luck, Adams or Graham that Cook lied by stating he was asked to work

"in the baghouse." JA 284-286, JA 176-177, JA 157-158, JA 361. Grace clearly

believed the use of "in" was a significant misstatement as she immediately

responded to Cook's e-mail by stating "[a]s discussed, the scope of your work is

outside." JA 379. In light of these undisputed facts, summary judgment was

warranted because no fact finder could reasonably conclude SDRBD's stated

reason for Cook's termination—its belief that Cook was lying and jeopardizing

Grace's and Luck's employment—was pretextual. *See CTB, Inc. v. Hog Slat, Inc.*,

954 F.3d 647, 658 (4th Cir. 2020) ("[A] party's self-serving opinion . . . cannot,

absent objective corroboration, defeat summary judgment."); *Cf. Rowe v.*

*Goldsboro Wayne Transp. Auth.*, 2015 WL 3650086, at *12 (E.D.N.C. June 11,

2015), *aff'd*, 628 F. App'x 183 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 207 (2016)

("[I]t is the perception of the decisionmaker that is relevant, and it does not matter

if [the employer] was correct in assessment of [plaintiff's] dishonesty, it only needs

to be the sincere reason for her termination"); *Bandy v. Advance Auto Parts, Inc.*,

2012 WL 6018741, at *7 (W.D. Va. Nov. 29, 2012), *aff'd*, 535 F. App'x 260 (4th

Cir. 2013) ("the pertinent inquiry is not whether the employee acted in a way so as to warrant termination, but whether the decisionmaker honestly believed the employee so acted").

### D.    Virginia Code § 40.1-51.2:1 Does Not Bar Employers From Terminating Dishonest Employees.

Virginia Code § 40.1-51.2:1 prohibits discrimination against an employee because he lodged a safety complaint:

> No person shall discharge or in any way discriminate against an employee because the employee has filed a safety or health complaint or has testified or otherwise acted to exercise rights under the safety and health provisions of this title for themselves or others.

Va. Code § 40.1-51.2:1. The legal standard for a violation of § 40.1-51-2.1 can be found in the Virginia Administrative Code, which provides:

> An employee's engagement in activities protected by Title 40.1 does not automatically render him immune from discharge or discipline for legitimate reasons. Termination or other disciplinary action may be taken for a combination of reasons, involving both discriminatory and nondiscriminatory motivations. In such a case, a violation of § 40.1-51.2:1 of the Code of Virginia has occurred if the protected activity was **a substantial reason** for the action, **or if the discharge or other adverse action would not have taken place "but for" engagement in protected activity**.

16 Va. Admin. Code 25-60-110. The terms "substantial reason" and "but for" indicate that, like § 40.1-27.3, a violation of § 40.1-51.2:1 requires a causal relationship between an employee's termination and his protected activity. *Cf.*

*Wells v. Whitaker*, 151 S.E.2d 422, 428 (1966) ("[F]actual causation is often described as the 'but for' or Sine qua non rule.").

Here, Cook did not engage in any protected activity because he was asked to work outside the baghouse where there was no need for a respirator or HAZMAT training. But even if Cook had engaged in protected activity, there is no causal relationship between his e-mail and termination as explained above. *See supra* § IV.C.3. It is undisputed that Cook lied in his e-mail by stating he was authorized to work in the baghouse, and that Cook knew his e-mail could get Luck and Grace in trouble. That is the very reason Cook was discharged—lying and imperiling the employment of Luck and Grace. Thus, Cook cannot show, as a matter of law, that he would not have been discharged "but for" his engagement in alleged protected activity.

A case strikingly similar to the facts of this case is *Clark v. General. Internal Medicine Group., Inc.,* 2021 WL 3669322 (E.D. Va. Aug. 18, 2021).[6] In *Clark,* the Court granted summary judgment of a claim under § 40.1-51.2:1 because there was "overwhelming evidence that [defendant] terminated plaintiff for his unprofessional behavior toward other staff members and because of the confusion caused by his unauthorized directives to staff and **inaccurate reports** that his

---

[6] Like § 40.1-27.3, there is a dearth of authority interpreting § 40.1-51.2:1 and consideration of the opinions of District Courts is therefore appropriate.

facility had no PPE." *Clark,* at *9 (emphasis added). The Court noted that the evidence showed, as is the case here, that "plaintiffs **'misrepresentation** of PPE at [the] facility, caus[ed] multiple team members to have to actually address that issue when there really wasn't an issue, [and] pull[ed] them away from potentially other serious situations." *Id.* (emphasis added). As a result, the Court found that while the plaintiff may have engaged in protected activity, "the manner in which he engaged in this activity [was] not protected." *Id.*; *see also Crews-Sanchez*, 2022 WL 2792207, at *12 (granting summary judgment under Section 40.1-51.2:1 where "Plaintiffs employment was terminated not in retaliation for her engaging in any protected activity, but rather, for the manner in which she engaged in such activity—i.e., Plaintiffs disclosure of confidential information about another employee to a third-party, without prior permission, and **exhibiting a lack of candor** to her superiors in the course of the investigation of the incident" (emphasis added)).

In sum, the evidence is undisputed that Cook lied about what he was asked to do on April 20, 2021 and tried to get his fellow employees in trouble with that falsehood. Section 40.1-51.2:1 simply does not protect such impertinent behavior.

## V.    CONCLUSION

For the foregoing reasons, SDRBD respectfully requests that this Court

affirm the judgment of the District Court and grant any other relief it deems just

and proper.

## VI.    ORAL ARGUMENT

SDRBD does not believe oral argument is necessary in this case, but will

participate in oral argument if the Court so desires.

Respectfully submitted,

ROANOKE ELECTRIC STEEL
CORPORATION d/b/a STEEL
DYNAMICS ROANOKE BAR DIVISION

By: /s/  Elaine D. McCafferty

Agnis C. Chakravorty, Esq. (VSB #30225)
Woods Rogers Vandeventer Black PLC
Wells Fargo Tower
10 South Jefferson Street
P.O. Box 14125
Roanoke, VA 24038-4125
(540) 983-7600
(540) 983-7711 (fax)
Agnis.Chakravorty@wrvblaw.com

Elaine D. McCafferty, Esq. (VSB #92395)
Woods Rogers Vandeventer Black PLC
123 East Main Street, 5th Foor,
P.O. Box 2496
Charlottesville, VA 22902
(434) 220-6833
(434) 956-3787
Elaine.mccafferty@wrvblaw.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7) because this brief contains 9244 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(f).

This brief has been prepared in size 14 point font and a proportionally

spaced typeface, Times New Roman.


/s/ Elaine D. McCafferty
Elaine D. McCafferty, Esq.